1

PACIFIC TRIAL ATTORNEYS
A Professional Corporation
Scott J. Ferrell, Bar No. 202091
sferrell@pacifictrialattorneys.com
4100 Newport Place Drive, Ste. 800
Newport Beach, CA  92660
Tel: (949) 706-6464
Fax: (949) 706-6469

Attorneys for Plaintiff

2

3

4

5

6

7

8              **UNITED STATES DISTRICT COURT**

9              **EASTERN DISTRICT OF CALIFORNIA**

10

| | |
|---|---|
| 11 | RUTH MARTIN, individually and on behalf of all others similarly situated, | Case No. 1:22-cv-01355-JLT-SAB |
| 12 | | |
| 13 | Plaintiff, | **FIRST AMENDED CLASS ACTION** |
| 14 | v. | **COMPLAINT FOR VIOLATION OF** |
| 15 | SEPHORA USA, INC., a Michigan corporation; and DOES 1 through 25, inclusive; | **THE CALIFORNIA INVASION OF** **PRIVACY ACT ("CIPA")** |
| 16 | | |
| 17 | Defendants. | Filed: October 23, 2022 Trial: None Set |

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

**Defendant Sephora USA Inc. ("Defendant") secretly enables and allows a third-party spyware company to eavesdrop on the private conversations of everyone who communicates through the chat feature at www.sephora.com (the "Website").   The spyware company then exploits and monetizes that data by sharing it with other third parties, which use the private chat data to bombard the unsuspecting visitor with targeted marketing.**

**Defendant does this without visitors' informed consent.   As a result, Defendant has violated the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code § 630, *et seq*.**

**JURISDICTION AND VENUE**

1.      This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1332 of the Class Action Fairness Act of 2005 because: (i) there are 100 or more class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) there is at least minimal diversity because at least one Plaintiff and Defendant are citizens of different states. Indeed, based upon the information available to Plaintiff, there are believed to be at least 5,000 class members, each entitled to $5,000 in statutory damages, thus making the amount in controversy at least $25,000,0000 exclusive of interests and costs. See <u>Cal. Penal Code</u> § 631 *et seq.*

2.      Pursuant to 28 U.S.C. § 1391, venue is proper because a substantial part of the acts and events giving rise to the claims occurred in this District.

3.      Defendant is subject to personal jurisdiction in this District because the exercise of jurisdiction over Defendant is not "inconsistent with the Constitution of this state or the United States."  Cal. Code Civ. Proc. § 410.10.  Indeed, Defendant operates retail stores throughout California and Plaintiff believes that Defendant generates a minimum of eight percent of its national website sales from Californians, such that the website "is the equivalent of a physical store in California." *Thurston v. Fairfield*

*Collectibles of Georgia*, 53 Cal. App. 5th 1231, 1235 (2020).  Since this case "arises out of the operation of the website", California courts can "properly exercise personal jurisdiction" over the Defendant in accordance with the Court of Appeal opinion in *Thurston v. Fairfield Collectibles of Georgia*, 53 Cal.App.5th 1231 (2020).

## PARTIES

4.     Plaintiff Ruth Martin ("Plaintiff") is a resident and citizen of California who lives within this Judicial District.  In late October 2022, while physically within California, Plaintiff visited Defendant's Website and conducted a brief conversation with a customer service representative of Defendant named "Anjelica" through the Website chat feature.  The conversation related to Defendant's products and return policies.  Plaintiff was not advised that the chat was monitored, intercepted, or recorded.

5.     Defendant Sephora is a French multinational retailer of personal care and beauty products with nearly 340 brands, including its own private label, Sephora. Defendant operates hundreds of stores throughout the United States.  With annual sales in excess of $10 billion, Defendant is one of the world's largest personal care retailers.

6.     Defendant owns, operates, and/or controls the Website.

## FACTUAL ALLEGATIONS

7.     CIPA prohibits both the wiretapping of and eavesdropping upon electronic communications without the consent of all parties to the communication.  Compliance with CIPA is easy, and most website operators comply by conspicuously warning visitors that their conversations are being recorded, intercepted, and/or eavesdropped upon.[1]

8.     Unlike most companies, Defendant *ignores* CIPA.  Instead, Defendant enables and allows an independent third party to eavesdrop upon and record all such conversations.  Why?  Because, as one industry expert notes, "*Live chat transcripts are*

---

[1]     https://www.leechtishman.com/insights/blog/the-california-invasion-of-privacy-act-californias-wiretap-act/ ("*CIPA Compliance is not difficult. A business must take certain steps. . .with a chat feature. . .to ensure that it obtains valid consent consistent with the holdings of courts interpreting CIPA.*") (last visited March 2023) (emphasis added).

*the gold mines of customer service. At your fingertips, you have valuable customer insight to make informed business decisions…. **When people are chatting, you have direct access to their exact pain points.***"). *See* https://www.ravience.co/post/improve-marketing-roi-live-chat-transcripts (last visited March 2023) (emphasis added).

9.  Shortly after being notified that this lawsuit would be filed, Defendant admitted for the first time that it records all chat transcripts. *See* https://www.sephora.com/beauty/privacy-policy#USHowWeCollect ("*We maintain a transcript of chats for quality assurance.*") (last downloaded March 2023) (emphasis added).

10.  Defendant's actions are not incidental to facilitating e-commerce, nor are they undertaken in the ordinary course of business. To the contrary, as noted above, Defendant's actions violate industry norms and the legitimate expectations of consumers.

11.  To enable the eavesdropping, Defendant has allowed a third party (hereinafter referred to as the "Third-Party Spyware Company") to secretly intercept, exploit, and monetize the chat conversations between Defendant and visitors to its Website.

12.  The Third-Party Spyware Company is believed to be a company called "LiveChat"; this allegation is made on information and belief, as Defendant has gone to great lengths to "mask" the identity of the Third-Party Spyware company from Website consumers. However, Defendant has allowed LiveChat to advertise that LiveChat operates Defendant's website chat feature. *See* https://www.livechat.com/customers/customer-stories/sephora/ (quoting Sephora executive Milena Wojewoda explaining that Sephora chose LiveChat because "*We liked the intuitive and easy-to-use interface, as well as the fact that we could give our customers the chance to rate our consultants. More importantly, we can monitor the quality of customer service thanks to advanced analytics.*" In the same article, Livechat admits that "*By using chat tags, Sephora knows that a majority of consultations are*

*related to sales.*").

13.    The Third-Party Spyware Company's chat service is an Application Programming Interface that is "plugged into" Defendant's Website. The chat function is run from the Third-Party Spyware's servers but allows for chat functionality on Defendant's Website. In other words, the Third-Party Spyware Company runs the Chat service from its own servers, but customers interact with the chat service on Defendant's Website, so it appears to users that they are communicating with a company representative of Defendant.

14.    Thus, whenever a chat message is sent from a member of the Class to Defendant, it is first routed through the Third-Party Spyware Company's server.  This enables the Third-Party Spyware Company to analyze and collect customer-support agent interactions in real time to create live transcripts of communications as they occur, among other services.  Indeed, the Third-Party Spyware Company confirms it provides real-time messaging. *See* https://developers.livechat.com/docs/messaging/customer-chat-api/rtm-reference/ (last downloaded March 2023).

15.    Defendant neither informs visitors of this conduct nor obtains their consent to these intrusions.  However, the Third-Party Spyware Provider's marketing materials make clear that it maintains transcripts of all user chat conversations.  *See* https://www.livechat.com/help/how-to-get-chat-transcripts/ ("*If you'd like to keep an additional archive of your chats, you can get complete chat transcripts from LiveChat.*") (emphasis added) (last downloaded March 2023).

16.    One might reasonably wonder why the Third-Party Spyware Company would be interested in intercepting and recording the Website chat interactions between Defendant and unsuspecting visitors to Defendant's Website.  As shown below, it is all about money.

13.    The Third-Party Spyware Company's chat software "integrates" with Meta subsidiaries like Facebook and WhatsApp. *See*

https://www.livechat.com/marketplace/apps/facebook-messenger/#description

("*Integrate your LiveChat with Facebook Messenger and have your Facebook and website communication in one place - for free.*") (last downloaded March 2023).

14.     In other words, this Integration allows the Third-Party Spyware Company to share data with Meta and its subsidiaries, and thus operate as a unified system. According to Bloomberg.com, this is all part of Meta's secret "**plan to profit from private chats.**" *See* https://www.bloomberg.com/news/articles/2022-02-15/meta-closes-1-billion-kustomer-deal-after-regulatory-review (last downloaded March 2023) (emphasis added).

15.     So how does it work? ***First***, Meta/Facebook identifies "user interests" by monitoring a collection of "offsite" user activity, such as the private chat communications between Defendant and visitors to its Website – both by "integrating" with the Third-Party Spyware Company's software and because Defendant has placed numerous Facebook "pixels" on its website.   According to Meta/Facebook, "*The Facebook pixel is a piece of code for your website that lets you measure, optimize and build audiences for your ad campaigns. You can think of this as an analytics tool that allows you to measure the effectiveness of your advertising by understanding the actions people take on your website.*").  *See* https://www.facebook.com/gpa/blog/the-facebook-pixel#:~:text=The%20Facebook%20pixel%20is%20a,people%20take%20on%20your%20website (last downloaded April 2023).

16.     ***Second***, Meta/Facebook generates revenue by selling advertising space through its subsidiaries' ability to identify those offsite user interests.

17.     ***Third and finally***, after harvesting the chat transcripts for valuable data, Meta's brands like Facebook and WhatsApp bombard the unsuspecting Website visitors with targeted advertising.

18.     Through the preceding acts, Meta's subsidiary can freely boast that it will "Transform      your      support      center      into      a      profit      generator."      *See*

https://www.kustomer.com/product/customer-service/ (last downloaded March 2023). Of course, Meta does this with Defendant's express knowledge and permission.

19.     Finally, all of the schemers – Defendant, the Third-Party Spyware Company, and Meta – profit from secretly exploiting the private chat data through targeted social media advertising because "*Targeted advertising allows brands to send different messaging to different consumers based on what the brand knows about the customer. The better a brand can demonstrate that it understands what its customers want and need, the more likely customers respond to advertising and engage with the brand. Social media targeting helps brands leverage consumers' behavior on the web, search engines, and social media sites to present ads that reflect consumer interests.*"[2]

20.     The Third-Party Spyware Company's exploitation, monetization, use of, and interaction with the data it gathers through the chat feature in real time makes it more than a mere "extension" of Defendant.

21.     At some point after being notified that Plaintiff intended to file suit, Defendant quietly admitted to the sum and substance of the entire scheme.  Specifically, Defendant updated its online privacy policy to **admit** that it "may" do **exactly** what Plaintiff alleges.     *See*     https://www.sephora.com/beauty/privacy-policy#USShareInformation ("*We may disclose your personal information with businesses that we have partnered with to jointly create and offer a product, service, or joint promotion.*") (last downloaded March 2023) (emphasis added).

22.     Given the nature of Defendant's business, visitors may share personal and confidential data and personally identifying information with Defendant via the Website chat feature.

23.     As noted above, Plaintiff visited Defendant's Website and had a brief conversation through the chat feature with a customer representative of Defendant.

---

[2] *See* https://www.adroll.com/blog/what-is-targeted-advertising#:~:text=Targeted%20advertising%20allows%20brands%20to,and%20engage%20with%20the%20brand (last visited March 2023) (emphasis added).

24.     Defendant did not inform Plaintiff or the Class members that Defendant was secretly allowing, aiding, and abetting the Third-Party Spyware Company to intercept and eavesdrop upon the conversations during transmission, and then exploit the data for their mutual gain.

25.     Defendant did not obtain Plaintiff's or the Class members' express or implied consent for the preceding intrusions, nor did Plaintiff or Class members know at the time of the conversations of Defendant's conduct.

## **CLASS ALLEGATIONS**

26.     Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class") defined as follows:

> **All persons within the state of California who, during the statute of limitations period: (1) communicated with Defendant via the chat feature on Defendant's Website; and (2) whose communications were recorded and/or eavesdropped upon without prior consent.**

27.     NUMEROSITY: Plaintiff does not know the number of Class members but believes the number to be in the thousands, if not more. The exact identities of Class members may be ascertained by the records maintained by Defendant.

28.     COMMONALITY: Common questions of fact and law exist as to all Class members and predominate over any questions affecting only individual members of the Class.  Such common legal and factual questions, which do not vary between Class members, and which may be determined without reference to the individual circumstances of any Class member, include but are not limited to the following:

a.     Whether Defendant aided and abetted a third party in eavesdropping upon and recording chat communications on the Website;

b.     Whether Plaintiff and Class members are entitled to statutory penalties; and

c.     Whether Plaintiff and Class members are entitled to injunctive relief.

29.   <u>TYPICALITY</u>: As a person who visited Defendant's Website and whose electronic communication was recorded, intercepted and eavesdropped upon, Plaintiff is asserting claims that are typical of the Class.

30.   <u>ADEQUACY</u>: Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in the class action litigation.  All individuals with interests that are actually or potentially adverse to or in conflict with the Class or whose inclusion would otherwise be improper are excluded.

31.   <u>SUPERIORITY</u>: A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class members is impracticable and inefficient.  Even if every Class member could afford individual litigation, the court system could not.  It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed.

## <u>CAUSE OF ACTION</u>

### Violations of the California Invasion of Privacy Act

### Cal. Penal Code § 631(a)

32.   Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

33.   Section 631(a) of California's Penal Code imposes liability upon any entity that "by means of any machine, instrument, contrivance, or in any other manner," (1) "intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system," or (2) "willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state" or (3) "uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so

obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section."

34.   Section 631 of the California Penal Code applies to internet communications and thus applies to Plaintiff's and the Class's electronic communications with Defendant's Website.  "Though written in terms of wiretapping, Section 631(a) applies to Internet communications.  It makes liable anyone who 'reads, or attempts to read, or to learn the contents' of a communication 'without the consent of all parties to the communication.'"  *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. 2022).

35.   The Third-Party Spyware Company's software that Defendant embedded on Defendant's Website to record and eavesdrop upon the Class's communications qualifies as a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct alleged herein.

36.   At all relevant times, Defendant intentionally caused the internet communication between Plaintiff and Class Members with Defendant's Website to be intercepted and recorded by the Third-Party Spyware company.  Defendant also aided and abetted, agreed with, employed, or conspired with the Third-Party Spyware Company to eavesdrop upon such conversations during transmission and in real time by knowingly embedding the software code for Third-Party Spyware Company's software on Defendant's Website.

37.   Defendant knows that Third-Party Software Company, through its software, captures the electronic communications of visitors to Defendant's Website, and pays Third-Party Software Company to conduct these activities.

38.   Plaintiff and Class Members did not expressly or impliedly consent to any of Defendant's actions.

39.   In a materially identical case, a court recently held that the above-described allegations state viable claims for violations of section 631(a) of CIPA.  *See Byars v.*

*The Goodyear Tire & Rubber Co.*, No. 5:22-cv-01358-SSS-KKx, 2023 WL 1788553, *4 (C.D. Cal. Feb. 3, 2023) (Sykes, J.) ("*Byars contends that Goodyear, using a third-party service, "intercepts in real time" a website visitors' chat conversation. Byars alleges that, using the chat conversation, website visitors share sensitive personal information. Because Byars has pled sufficient facts to show the contents of the communications and that the communications were intercepted, Byars has sufficiently stated a claim under § 631(a).*") (emphasis added).

40.     Defendant's conduct constitutes numerous independent and discreet violations of Cal. Penal Code § 631(a), entitling Plaintiff and Class Members to injunctive relief and statutory damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for the following relief against Defendant:

1.     An order certifying the Class, naming Plaintiff as the representative of the Class and Plaintiff's attorneys as Class counsel;

2.     An order declaring Defendant's conduct violates CIPA;

3.     An order of judgment in favor of Plaintiff and the Class and against Defendant on the causes of action asserted herein;

4.     An order enjoining Defendant's conduct as alleged herein and any other injunctive relief that the Court finds proper;

5.     Statutory damages pursuant to CIPA;

6.     Reasonable attorneys' fees and costs; and

7.     All other relief that would be just and proper as a matter of law or equity, as determined by the Court.

Dated:  April 4, 2023                    PACIFIC TRIAL ATTORNEYS, APC


                                        By: */s/ Scott J. Ferrell*
                                        Scott. J. Ferrell
                                        Attorneys for Plaintiff

**CERTIFICATE OF SERVICE**

I hereby certify that on April 4, 2023, I electronically filed the foregoing **FIRST AMENDED CLASS ACTION COMPLAINT** with the Clerk of the Court using the CM/ECF system which will send notification of such filing via electronic mail to all counsel of record.

*/s/ Scott J. Ferrell*
Scott J. Ferrell

FIRST AMENDED CLASS ACTION COMPLAINT